753 A.2d 1137

CATHERINE P. GILHOOLEY, PLAINTIFF–APPELLANT, v. COUNTY OF UNION AND UNION COUNTY SHERIFF'S DEPARTMENT, DEFENDANTS–RESPONDENTS, AND JOHN DOES 1–4 (SAID NAMES BEING FICTITIOUS AND UNKNOWN), DEFENDANTS.

Argued May 1, 2000—Decided July 11, 2000.

534

*Richard A. Dunne,* argued the cause for appellant.

*John J. Kane,* argued the cause for respondents (*Lynch Martin Kroll,* attorneys; *Eric Kuper,* on the letter in lieu of brief).

The opinion of the Court was delivered by

LONG, J.

Once again we are faced with the issue of whether a particular injury constitutes the "permanent loss of a bodily function" within the meaning of the Tort Claims Act, *N.J.S.A.* 59:1-1 to 59:12-3, so as to justify the award of pain and suffering damages under *N.J.S.A.* 59:9-2(d).

## I.

In 1994, plaintiff, Catherine Gilhooley, was employed as a clinical social worker for the United States Department of Veterans Affairs("VA"). In that capacity, Mrs. Gilhooley was responsible for supervising the VA's methadone maintenance clinic in Newark. As part of her responsibilities, Mrs. Gilhooley accompanied nurses who administered methadone to incarcerated veterans.

On December 31, 1994, Mrs. Gilhooley accompanied a VA nurse to the Union County Jail to administer methadone. Upon completion of the visit, Mrs. Gilhooley stepped off the elevator into the entrance lobby of the building where a maintenance worker was cleaning the floor. Because the floor was wet with soap, a sheriff's officer standing nearby assisted Mrs. Gilhooley across the floor. Mrs. Gilhooley exited the building and proceeded down an inclined cement ramp where she slipped and fell forward, injuring her right knee and nose. Mrs. Gilhooley claims that her fall was caused by the soapy residue that had accumulated on the bottom of her shoes after walking through the lobby of the jail.

After her fall, Mrs. Gilhooley was transported by ambulance to St. Elizabeth's Hospital in Elizabeth where doctors diagnosed her with a fractured nose and fractured right patella. The following day, Mrs. Gilhooley was examined by Kevin J. Egan, M.D., an orthopaedic surgeon. Dr. Egan determined that Mrs. Gilhooley's knee fracture resulted in the disruption of the extensor mechanism leaving her with a complete loss of quadriceps power.

As explained in a letter from Dr. Egan, the loss of quadriceps power is "a very disabling injury prohibiting stair climbing, chair ascent and descent as well as any form of efficient walking." Accordingly, Dr. Egan advised Mrs. Gilhooley that her patella required restructuring through a surgical procedure known as an open reduction internal fixation. That surgery required Dr. Egan to insert into Mrs. Gilhooley's patella two K-wires, or "pins," and a single "AO tension band wire." Those fixation devices were

necessary to "re-establish the integrity" of Mrs. Gilhooley's patella.

Mrs. Gilhooley recovered in the hospital for five days and wore a cast that extended from the top of her thigh to her ankle for three weeks. After the surgical cast was removed, Mrs. Gilhooley wore a "long-leg rehab brace" for an additional two-and-a-half months. Mrs. Gilhooley remained out of work until April 2, 1995.

After recovering from the surgery, Mrs. Gilhooley was left with a scar that measures approximately four to five inches long and extends in a linear fashion over the forward portion of her knee from the bottom of her thigh down to just below the kneecap. Since the accident, Mrs. Gilhooley has returned to work in her full capacity; however, she experiences constant stiffness and pain in her knee. The injury to Mrs. Gilhooley's nose did not require any form of surgery or treatment, although she complains of nasal drip.

On December 23, 1996, Mrs. Gilhooley filed a complaint alleging negligence on the part of the County of Union and the Union County Sheriff's Department (collectively, "defendants"). Defendants filed a motion for summary judgment, asserting that Mrs. Gilhooley's injuries did not meet the threshold required by the Tort Claims Act ("Act") pursuant to *N.J.S.A.* 59:9–2(d), which prohibits recovery of pain and suffering damages unless the injured party can demonstrate either permanent loss of a bodily function, permanent disfigurement, or dismemberment.

Following oral argument, the trial court granted summary judgment in favor of defendants. The record reveals, however, that that determination was not based on Mrs. Gilhooley's claim that the injury to her knee constituted a permanent loss of a bodily function. Indeed, although both parties briefed the issue, neither argued it and the trial court failed to address that component of Mrs. Gilhooley's claim. In granting summary judgment, the trial court relied on the standard enunciated in *Falcone v. Branker*, 135 *N.J.Super.* 137, 152, 342 *A.*2d 875 (Law Div.1975),

, and determined that Mrs. Gilhooley's scar did not constitute a permanent disfigurement.

In an unpublished opinion, the Appellate Division affirmed the trial court's grant of summary judgment in favor of defendants. Although the trial court had omitted consideration of Mrs. Gilhooley's claim that her knee injury constituted the permanent loss of a bodily function, the Appellate Division determined that the objective medical evidence presented in the record did not support such a claim. Rather, the Appellate Division determined that Mrs. Gilhooley suffered only a temporary loss of bodily function, evidenced by the fact that she was fully capable of returning to work, sought no further treatment for either injury, and takes no medication for her condition. Finally, the Appellate Division affirmed the trial court's determination that Mrs. Gilhooley's scar did not constitute a permanent disfigurement under *N.J.S.A.* 59:9–2(d).

We granted Mrs. Gilhooley's petition for certification. 163 *N.J.* 11, 746 *A.*2d 457 (2000).

## II.

In 1972, in response to the judicial abrogation of sovereign immunity in *Willis v. Department of Cons. & Econ. Dev.,* 55 *N.J.* 534, 540, 264 *A.*2d 34 (1970), the Legislature adopted the Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3. The overall purpose of the Act was to reestablish the immunity of public entities while coherently ameliorating the harsh results of the doctrine. *N.J.S.A.* 59:1–2. The theme of the Act is immunity for public entities with liability as the exception. *Collins v. Union County Jail,* 150 *N.J.* 407, 413, 696 *A.*2d 625 (1997). Even where liability is present, the Act sets forth limitations on recovery. One is the limitation on the recovery of pain and suffering damages:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.
>
> [*N.J.S.A.* 59:9–2(d).]

Unlike a lawsuit against a private entity in which pain and suffering is a recoverable element of damages,

> [t]he limitation on the recovery of damages in subparagraph (d) reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances-cases involving permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00. The limitation that pain and suffering may only be awarded when medical expenses exceed $1,000 insures that such damages will not be awarded unless the loss is substantial.
>
> [Harry A. Margolis and Robert Novack, *Claims Against Public Entities*, 1972 Task Force Comment on *N.J.S.A.* 59:9–2 (Gann 2000).]

That is the statutory scheme against which the grant of summary judgment in favor of defendants must be analyzed.

## III.

We turn first to the issue of whether Mrs. Gilhooley suffered a permanent loss of a bodily function under the Tort Claims Act. Our most recent pronouncement on this subject is *Brooks v. Odom*, 150 *N.J.* 395, 696 *A.*2d 619 (1997). In *Brooks*, the plaintiff sued New Jersey Transit for injuries sustained when a bus struck her open car door. *Id.* at 398, 696 *A.*2d 619. After being taken to the hospital, Mrs. Brooks had numerous complaints: headaches; dizziness; blurred vision; pain and stiffness in the neck, back, and shoulder; and decreased motion. *Ibid.* Despite therapy, the plaintiff's neck and back pain persisted. *Id.* at 399, 696 *A.*2d 619. She ultimately was diagnosed with "residuals of post-traumatic headaches, residuals of flexion/extension injury of the cervical dorsal and lumbar spine with post-traumatic myositis and fibromyositis." [1] *Id.* at 400, 696 *A.*2d 619. Eventually, Mrs. Brooks returned to work and performed household chores, albeit with some difficulty. *Ibid.* The trial court granted summary judgment to defendants based on the nature of Mrs. Brooks' injuries. The Appellate Division reversed and we, in turn, reinstated the Law

---

[1] Myositis is defined as an "inflammation of a muscle." *Stedman's Medical Dictionary* 922 (5th ed.1982).

Division judgment. *Id.* at 407, 696 *A.*2d 619. In doing so, we set forth some of the ground rules for evaluating a claim that a party's injuries warrant the allowance of pain and suffering damages:

> To recover under the Act for pain and suffering, a plaintiff must prove by objective medical evidence that the injury is permanent. Temporary injuries, no matter how painful and debilitating, are not recoverable. Further, a plaintiff may not recover under the Tort Claims Act for mere "subjective feelings of discomfort." Judicial and secondary authority interpreting the phrase "permanent loss of a bodily function" is scant. One recognized text states "[t]o be considered permanent within the meaning of the subsection, an injury must constitute an 'objective' impairment, such as a fracture." Absent such an objective abnormality, a claim for permanent injury consisting of "impairment of plaintiff's health and ability to participate in activities" merely iterates a claim for pain and suffering.
>
> [*Id.* at 402–03, 696 *A.*2d 619 (citations omitted).]

Additionally in *Brooks*, we noted:

> According to the Appellate Division, a claim for emotional distress is recoverable if it results "in permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight." Consistent with *Srebnik [v. State,* 245 *N.J.Super.* 344, 351, 585 *A.*2d 950 (App.Div.1991) ], one part of the Appellate Division found that a chronic lumbo-sacral sprain with a fifteen percent permanent disability did not constitute sufficient objective evidence to survive the defendant's motion for summary judgment. By comparison, another part has ruled that a plaintiff could survive a motion for summary judgment when her complaints included total loss of taste and smell, as well as constant headaches, daily dizziness, acute pain in her skull, facial twitching, an inability to eat hard foods, ringing in her ears, and the inability to bend or walk for longer than twenty minutes. As those cases indicate, permanent loss of eyesight, taste and smell satisfy the statutory standard.
>
> [*Brooks, supra,* 150 *N.J.* at 403, 696 *A.*2d 619 (citations omitted).]

After distinguishing the No–Fault scheme from the Tort Claims Act, we concluded:

> Although the legislative intent in the Tort Claims Act is not completely clear, we believe that the Legislature intended that a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial. A total permanent loss of use would qualify. We doubt, however, that the Legislature intended that a claimant could recover only for losses that were total. As the Workers' Compensation Act demonstrates, the Legislature is aware of the distinction between permanent injuries that are total and those that are partial. In the Tort Claims Act, however, the Legislature did not specify that the right to recover was limited to injuries that were total. We conclude that under that Act plaintiffs may recover if they sustain a loss that is substantial.
>
> [*Id.* at 406, 696 *A.*2d 619 (citation omitted).]

Recapping, in *Brooks* we clarified that in order to vault the pain and suffering threshold under the Tort Claims Act, a plaintiff

must satisfy a two-pronged standard by proving (1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial. In *Brooks*, we identified a number of injuries that, if supported by medical proof, obviously meet both prongs of the standard: injuries causing blindness, disabling tremors, paralysis and loss of taste and smell. *Id.* at 403, 696 *A.*2d 619. Indeed such injuries, by their very nature, are objectively permanent and implicate the substantial loss of a bodily function (e.g., sight, smell, taste, and muscle control).

However, that every objective permanent injury results in substantial loss of a bodily function does not follow. An easy example is a completely healed fracture without any objective evidence of permanent substantial impairment. *Hammer v. Township of Livingston,* 318 *N.J.Super.* 298, 305, 723 *A.*2d 988 (App.Div.1999) (finding that subjective complaints of pain coupled with fully healed fracture did not amount to permanent impairment). On the contrary, if the victim of a healed fracture of the patella, as a result of age or pre-condition can no longer ambulate, she will have met the *Brooks* standard. Each case is fact sensitive. Thus, in *Brooks*, we assessed plaintiff's injury as factually meeting one prong of the standard but failing to meet the other:

> In reviewing the sufficiency of plaintiff's case, we accept that she experiences pain and that the limitation of motion in her neck and back is permanent. Still, she can function both in her employment and as a homemaker. In brief, she has not sustained "a permanent loss of a bodily function" within the meaning of *N.J.S.A.* 59:9–2(d).

[150 *N.J.* at 406, 696 *A.*2d 619.]

## IV.

The question before us is where on the continuum of cases Mrs. Gilhooley's reconstructed knee can be considered to fall. Although not a perfect analogy to any class on the continuum, we think it is properly characterized as a permanent injury resulting in a substantial loss of bodily function. There is no question that Mrs. Gilhooley suffered a permanent injury. The fractured patella is plainly an objective impairment recognized by

*Brooks.* 150 *N.J.* at 403, 696 *A.*2d 619. Moreover, the accident caused Mrs. Gilhooley to lose forever the normal use of her knee that, thereafter, could not function without permanent pins and wires to re-establish its integrity. Like the victim who suffers an eye injury requiring a lens implant or an ear injury requiring a hearing aid mechanism, Mrs. Gilhooley has permanently lost a bodily function. We have absolutely no doubt that the Legislature intended that pain and suffering damages could be awarded to such persons even if their ability to use their bodily parts efficiently is restored through pins, wires, lenses or any other artificial mechanisms or devices. Defendants' essential claim is that, after her surgery, Mrs. Gilhooley was as good as new. Not so. She now requires pins and wires inside her body in order for her knee to function.

That the meaning of a phrase can be gleaned from associated words is a well established principle of statutory construction. *State, Tp. of Pennsauken v. Schad,* 160 *N.J.* 156, 172, 733 *A.*2d 1159 (1999) (acknowledging doctrine of *noscitur a sociis* establishing principle that meaning of a word can be controlled by surrounding words); *In re Liquidation of Sussex Mutual Ins. Co.,* 301 *N.J.Super.* 595, 603, 694 *A.*2d 312 (App.Div.1997)("[A] guide to legislative intent is found in the context of the words with which they are associated."). In our view, Mrs. Gilhooley's injury is more akin to the permanent dismemberment or permanent disfigurement categories in *N.J.S.A.* 59:9–2(d) than it is to the kind of non-objective injuries from which the Legislature sought to shield public entities from pain and suffering damages. As the Task Force that crafted the Tort Claims Act explained, pain and suffering damages are reserved for "aggravated circumstances."

We are satisfied that the Legislature intended to include within the notion of aggravated cases those involving permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function. As is the case with dismemberment and disfigurement, when pins, wires, mechanisms and devices are required

to make the plaintiff normal, the statutory standard is met. The fact that a physician has jury-rigged the knee to function with pins and wires in no way inhibits the characterization of that injury as the permanent loss of a bodily function. The same would be true of a plaintiff whose vision is restored with a lens, one whose hearing is restored with a hearing aid, and one whose heart is operating efficiently with a pacemaker or implanted valve. We conclude that those are all aggravated cases within the contemplation of the Legislature when it enacted the "permanent loss of bodily function" language and that they fall squarely within the "substantial" requirement of *Brooks*. Accordingly, the knee injury vaulted Mrs. Gilhooley over the pain and suffering threshold of *N.J.S.A.* 59:9–2(d).

### V.

We turn next to the grant of summary judgment to defendants in connection with Mrs. Gilhooley's claim of permanent disfigurement. *Hammer, supra,* 318 *N.J.Super.* at 310, 723 *A.*2d 988, is instructive on that issue.

In *Hammer,* the plaintiff was struck by a vehicle driven by the municipal fire chief. 318 *N.J.Super.* at 301, 723 *A.*2d 988. Her injuries resulted in a scar that was "at least fifteen centimeters long and [ran] the length of her knee cap, ending in an indentation near the bottom of the scar that [wa]s discolored and mottled." *Id.* at 303, 723 *A.*2d 988. The plaintiff also exhibited "facial scars extending from her right lower lip to her chin and from the corner of her right eye to her nose, [and a] scar on her elbow which [wa]s shaped like an inverted 'V.'" *Id.* at 309, 723 *A.*2d 988. The trial court granted summary judgment to defendant on plaintiff's claim for pain and suffering damages based on permanent disfigurement. *Id.* at 304, 723 *A.*2d 988. The Appellate Division reversed. *Id.* at 311, 723 *A.*2d 988. Because no case law had previously addressed "permanent disfigurement" under the Tort Claims Act, the Appellate Division applied the objective standard enunciated in *Falcone, supra,* 135 *N.J.Super.* 137, 342 *A.*2d 875, that ad-

dressed "permanent significant· disfigurement" under *N.J.S.A.* 39:6A–8a, New Jersey's original No-Fault statute. *Hammer, supra,* 318 *N.J.Super.* at 308, 723 *A.2d* 988.

Based on that standard, the *Hammer* court declared that in order to be considered a permanent disfigurement, a scar must impair or injure the beauty, symmetry, or appearance of a person, rendering the bearer unsightly, misshapen or imperfect, deforming her in some manner. *Ibid.* (quoting *Falcone, supra,* 135 *N.J.Super.* at 145, 342 *A.2d* 875). Citing *Puso v. Kenyon,* 272 *N.J.Super.* 280, 639 *A.2d* 1120 (App.Div.1994), *Hammer* also acknowledged that a number of factors should be considered, including appearance, coloration, existence and size of the scar, as well as, shape, characteristics of the surrounding skin, remnants of the healing process, and any other cosmetically important matters. *Id.* at 308–09, 723 *A.2d* 988. Additionally, the court concluded that *Brooks* requires that the disfigurement must not only be "permanent" but "substantial" as well. *Id.* at 308, 723 *A.2d* 988.

The Appellate Division in *Hammer* reversed the trial court's grant of summary judgment because the record raised a factual dispute in connection both with the permanency and the substantiality of the disfigurement. *Id.* at 310, 723 *A.2d* 988. *Hammer* spoke in terms relevant to the inquiry before us:

> We cannot conclude, as the motion judge apparently did, that the scars, as depicted in the photographs, are so insubstantial that no rational fact-finder could determine that one or more of them "impair" plaintiff's appearance, rendering her "unsightly," "misshapen," or "imperfect[.]" To withstand a motion for summary judgment, the non-moving party need only present "competent evidential materials ... [which], when viewed in the light most favorable to [that] party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in [that party's] favor...." Here, at the very least, the record raises a factual dispute concerning plaintiff's claim that her scars constitute permanent and substantial disfigurements. In such a case, it is not the judge's function to weigh the evidence and determine the truth of matter but only to determine whether there is such a dispute. It is only when the evidence is so one-sided that a judge may decide that one party should prevail as a matter of law. Consequently, the judge erred in concluding as a matter of law that plaintiff did not suffer a permanent disfigurement that is substantial. Accordingly, we reverse and remand for trial.

[*Ibid.* (citations omitted).]

■ Here, the record demonstrates that the trial court, in granting summary judgment in favor of defendants, failed to apply the appropriate summary judgment standard. Indeed, the court never determined that no rational fact-finder could render a judgment in favor of Mrs. Gilhooley. Instead, the judge erroneously weighed the evidence and, applying his own personal standard, determined the merits of the case:

> If it has to have something to do with unattractiveness of her and in looking at her knee specifically, there's nothing that I found unattractive about looking at her because of the scar on her knee.... It's not disfiguring. It's not just the location, but when you look at her in a bathing suit or what everyone would look at her, you wouldn't give a second thought to it. She had something happen to her knee; that's obvious. She had some procedure to her knee, but to say that it would materially detract from her appearance, her appearance isn't significantly detracted from because of this.

The court continued:

> You can see it. There's no question you can see it. It seems to be a resolved scar. There is some indentation on one side, and you can see it. You can see it, and there's nothing wrong with it. It's not ugly. It's not disfiguring in the sense that if this is the standard, that it would attract immediate attention in the sense that it would materially detract from her appearance, I don't find that it does those things. It is something that if you looked for it, you'd have no problem finding it. If I'm looking at her, I wouldn't look at it twice. I wouldn't even notice it or pay attention to it. It's just nothing. It isn't that small to be *de minimus* that you can't see it if you're looking for it or if you're looking at her knee in particular. But having said that, it doesn't detract from her appearance. There's nothing about where it is on her knee in looking at her general condition that makes anybody focus on that in the sense of drawing back or saying, this is an unpleasantness or it is detracting from her. It's better if you don't have it, I'm sure. But if it's on the crux, if it has to be significant in the sense of detracting from her, it simply doesn't.... [I]f the standard is whether it materially detracts from her appearance, I can't fact find that it materially detracts from her appearance.

■ As that reasoning reveals, the trial court resolved a dispute on the merits that should have been decided by a jury. It was not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact existed. *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Only when the evidence is utterly one-sided may a judge decide that a party should prevail as a matter of law. *Ibid.* That is not this case.

Although we have not had the benefit of photographs of Mrs. Gilhooley's scar, based upon the trial court's own description of it, we cannot conclude that it is so insubstantial that no rational fact-finder could determine that it impairs Mrs. Gilhooley's appearance, rendering her "unsightly," "misshapen" or "imperfect." *Falcone, supra,* 135 *N.J.Super.* at 145, 342 *A.*2d 875.

## VI.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for proceedings consistent with this opinion.

VERNIERO, J., dissenting.

This dispute centers on the standard to be used in sustaining non-economic damages (*i.e.,* amounts for pain and suffering) against a public entity. The case does not pertain to an award for medical expenses. The critical language in *Brooks v. Odom,* 150 *N.J.* 395, 406, 696 *A.*2d 619 (1997), requires that to recover non-economic damages under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3 (the Act), "a plaintiff must sustain a permanent loss of the use of a bodily function that is substantial." The Court takes that once-integrated standard and divides it in two: one part focusing on plaintiff's injury, the other part focusing on the loss of the bodily function. In so doing, the Court, in my view, places insufficient emphasis on the loss of the bodily function and thereby alters the focus of the analysis in a manner inconsistent with the Act.

I find the proper focus under both the statute and *Brooks* to be on the loss of the bodily function, not on the injury. Viewed from that perspective, plaintiff's claim is insufficient because her bodily function (the use of her knee) has been fully restored. As the Court in *Brooks* emphasized, "[t]emporary injuries, no matter how painful and debilitating, are not recoverable." *Id.* at 403, 696 *A.*2d 619. Thus, I agree with the Appellate Division's conclusion that summary judgment was the appropriate disposition.

The Court arrives at a contrary conclusion by reasoning that the existence of the pin in plaintiff's knee is itself sufficient to show, as a threshold matter, that a permanent loss of a bodily function has occurred. The Court reaches its conclusion notwithstanding that the knee is functioning completely and well. Moreover, the record reveals that plaintiff was fully capable of returning to work, sought no further treatment for her injuries and requires no medication for her condition. Unlike the majority, I cannot conclude with confidence that the Legislature intended taxpayers to be exposed to liability for an award for pain and suffering on these facts.

Indeed, the purpose of the Tort Claims Act "was to reestablish the general rule of the immunity of public entities from liability for injuries to others. Underlying the reenactment of immunity was the Legislature's concern about that liability on the public coffers." *Id.* at 402, 696 *A.*2d 619 (citation omitted). In my view, it is the role of the Legislature, not the judiciary, to lower the bar of the Tort Claims Act. Until the Legislature so acts, we must enforce the statute's high threshold, as we did in *Brooks.*

My concern is that the Court's holding may lead to incongruous results in future cases. In *Brooks,* the plaintiff experienced pain and the limitation of motion in her neck and back was permanent, *id.* at 406, 696 *A.*2d 619; however, that was not enough to satisfy the Act's pain-and-suffering threshold. Here, plaintiff suffers no loss of movement and her knee is functioning properly; yet, she is found to have satisfied the *Brooks* standard. Viewing the two injuries solely from the perspective of loss of movement or loss of the respective bodily functions, the *Brooks* plaintiff arguably suffered more of a permanent loss than did plaintiff in this case. I do not believe that the doctor's insertion of a pin in plaintiff's knee, without more, is sufficient to distinguish this case from a case like *Brooks* in which recovery was denied.

In respect of the scar issue, I do not believe that we should reverse the trial court without first remanding the matter to obtain the benefit of photographs or some other evidence on which

to base our disposition. In granting summary judgment in favor of defendants, the trial court observed the injury; we have not. Nor have we been provided with any photographic evidence. Under those circumstances, I do not believe that we should substitute our judgment for that of the trial court. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). If there is a question concerning the validity of the lower court determination, I would remand for purposes of supplementing the record to enable us to better perform our appellate function.

For the above reasons, I respectfully dissent.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG and LaVECCHIA—6.

*For affirmance*—Justice VERNIERO—1.